[Cite as *Allen v. Allen*, 2022-Ohio-3198.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## GEAUGA COUNTY

| | |
|---|---|
| KAREN S. ALLEN, | **CASE NO. 2021-G-0023** |
| Plaintiff-Appellee, | |
| - v - | Civil Appeal from the<br>Court of Common Pleas,<br>Domestic Relations Division |
| DAVID LEE ALLEN, et al., | |
| Defendant-Appellant. | Trial Court No. 2016 DC 000775 |

**O P I N I O N**

Decided: September 12, 2022
Judgment: Affirmed

*Ryan P. Nowlin*, Schneider, Smeltz, Spieth, Bell, LLP, 1375 East Ninth Street, Suite 900, Cleveland, OH 44114 (For Plaintiff-Appellee).

*Hans C. Kuenzi*, Hans C. Kuenzi Co., LPA, The Offices at Pinecrest, 100 Park Avenue, Suite 210, Orange Village, OH 44122 (For Defendant-Appellant).


MARY JANE TRAPP, J.

{¶1}   Appellant, David L. Allen ("Mr. Allen"), appeals from the judgment of the Geauga County Court of Common Pleas, Domestic Relations Division, overruling his objections to the magistrate's decision and denying his motions (1) for additional orders to enforce the assignment of retirement benefits; (2) to rescind permission to make direct spousal support payments; (3) to show cause; and (4) for attorney fees.  Mr. Allen's motions relate to the divorce decree between himself and his former spouse, appellee Karen S. Allen ("Ms. Allen").

{¶2}     Mr. Allen asserts five assignments of error.  In his first assignment of error, Mr. Allen contends that the trial court erred by excluding evidence regarding Ms. Allen's alleged "lack of credibility" and "deceptive conduct."   In his second through fifth assignments of error, Mr. Allen contends that the trial court erred in denying each of his four motions.

{¶3}     After a careful review of the record and pertinent law, we find that the trial court did not abuse its discretion in adopting the magistrate's decision.

{¶4}     (1) The trial court did not abuse its discretion in adopting the magistrate's exclusion of evidence of Ms. Allen's alleged pre-divorce conduct.  Mr. Allen's proffered evidence was not admissible as "other-acts" evidence pursuant to Evid.R. 404(B) as a matter of law, and the magistrate exercised reasonable control of the proceedings by limiting the cross-examination of Ms. Allen to the issues raised in Mr. Allen's motions.

{¶5}     (2) The trial court did not abuse its discretion in denying Mr. Allen's motion for additional orders.  Mr. Allen sought to modify the divorce decree to add additional terms rather than to enforce it.  Without Ms. Allen's express written agreement, the trial court lacked jurisdiction to do so.

{¶6}     (3) The trial court did not abuse its discretion in denying Mr. Allen's motion to show cause.  Mr. Allen received all requested documentation prior to filing his motion to show cause.   In addition, based on the decree's unambiguous language, the reimbursement payments Ms. Allen received from her employer did not constitute *earned* gross income subject to division as spousal support.  Further, Mr. Allen stipulated that issues involving a 2017 bonus were not subject to his motion to show cause.

{¶7} (4) The trial court did not abuse its discretion in denying Mr. Allen's motion for attorney fees for Ms. Allen's alleged "contemptuous conduct." Since we find no error in the trial court's decision not to hold Ms. Allen in contempt, Mr. Allen's motion for attorney fees necessarily lacks merit.

{¶8} (5) The trial court did not abuse its discretion in denying Mr. Allen's motion to rescind Ms. Allen's permission to make direct spousal support payments. The magistrate's decision is supported by Ms. Allen's testimony and documentary evidence, and we see no basis to disturb its credibility determinations.

{¶9} Thus, we affirm the judgment of the Geauga County Court of Common Pleas, Domestic Relations Division.

## Substantive Facts and Procedural History

{¶10} Mr. Allen and Ms. Allen were married in 1992 and had two children. In 2018, the trial court filed a judgment entry of divorce, which was subsequently corrected via a nunc pro tunc entry ("the divorce decree").

### *The Divorce Decree*

{¶11} The divorce decree requires Ms. Allen to pay spousal support directly to Mr. Allen, as follows: (1) effective January 1, 2018 and continuing each year thereafter, 45% of her "total gross annual base salary" and 45% of her "gross income earned through incentives, bonuses and enhancement income plans," payable on or before the first of each month; (2) 45% of her "monthly gross base salary" and 45% of her "gross income from incentives, bonuses, enrichment income plans, and other income above and beyond her base pay earned after January 1, 2018," upon receipt; and (3) 50% of her "gross income from incentives, bonuses, enrichment income plans, and other earned income

3

above and beyond her base pay earned prior to January 1, 2018 and payable in 2018 through 2020," upon receipt. As "income verification," Ms. Allen is required to provide Mr. Allen with her "end of year earnings statement(s) and Federal and State Tax Returns."

{¶12} The divorce decree divided some of Ms. Allen's retirement and benefit plans in the ratio of 55% to Mr. Allen and 45% to Ms. Allen. A list of six plans subject to this division was attached to the decree as a joint exhibit. Four of the plans were to be divided pursuant to qualified domestic relations orders ("QDROs"),[1] the terms of which were attached as joint exhibits. A QDRO for each plan was subsequently filed in the trial court.

{¶13} The fifth plan, known as the "2005 Excess Defined Contribution Plan," is nonqualified, meaning it could not be divided pursuant to a QDRO. The divorce decree requires Ms. Allen to pay Mr. Allen's share directly as spousal support immediately upon her "receipt/withdrawal." The decree provides that a QDRO will be issued in the event the plan's nonqualified status changes. The decree does not specifically address the division of the sixth plan, known as the "2005 Excess Defined Benefit Plan," which is also nonqualified.

{¶14} The decree provides that "the Court retains jurisdiction with respect to the QDRO(s) to the extent required to maintain its qualified status and the original intent of the parties. The Court also retains jurisdiction to enter further orders as are necessary to enforce the assignment of benefits to the non-participant as set forth herein, including the re-characterization thereof as a division of benefits under another plan, as applicable, or

---

1. A QDRO is an order that "'creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan.'" *State ex rel. Sullivan v. Ramsey*, 124 Ohio St.3d 355, 2010-Ohio-252, 922 N.E.2d 214, ¶ 18, quoting the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1056(d)(3)(B)(i)(I), and 26 U.S.C. 414(p)(1)(A)(i).

4

to make an award of spousal support, if applicable, in the event that the participant fails to comply with the provisions of this order."

### The Parties' Disputes

{¶15} During 2019 and 2020, Mr. Allen raised several issues relating to the divorce decree.

{¶16} In a pro se letter to opposing counsel, Mr. Allen requested several revisions to the decree, including provisions dividing the 2005 Excess Defined Benefit Plan in the same manner as the 2005 Excess Defined Contribution Plan; requiring Ms. Allen to provide documents and reports relating to all plans; and ensuring he will receive his share of benefits in the nonqualified plans in the event Ms. Allen should predecease him.

{¶17} A second issue involved Ms. Allen's receipt of non-deferred bonus in early 2017. Although the decree required Ms. Allen to pay Mr. Allen's share upon receipt, she did not do so until late 2019. According to Ms. Allen, however, she had mistakenly relied on the prior version of the decree that did not contain this obligation.

{¶18} A third issue involved whether Ms. Allen was providing all required financial documents to Mr. Allen as income verification.

{¶19} A fourth issue involved Ms. Allen's participation in her employer's "Financial Planning Reimbursement Program." Under this program, Ms. Allen was reimbursed for out-of-pocket expenses incurred for professional services, such as financial planning, the preparation of legal documents, and tax services. The reimbursements were treated as taxable income and reported on Ms. Allen's W-2 forms but were not considered income for benefit purposes. Prior to 2020, Ms. Allen was also "grossed up" for the applicable

5

taxes. The parties disputed whether Ms. Allen was required to pay a portion of these reimbursements to Mr. Allen as spousal support.

{¶20} A fifth issue involved Ms. Allen's untimely payment of spousal support on two occasions. In October 2019, Mr. Allen received his payment in the mail two days late. Ms. Allen suggested alternative payments options, but Mr. Allen did not respond. In January 2020, Mr. Allen received his payment one day late. Ms. Allen suggested that he authorize her to make direct deposits into his bank account. Mr. Allen declined and told her to mail the check earlier. Ms. Allen began mailing the checks by the fifteenth of the month.

### *Mr. Allen's Motions*

{¶21} In 2020, Mr. Allen filed three motions in the trial court: a "motion for additional orders to enforce the assignment of retirement benefits"; a "motion to rescind permission to make direct spousal support"; and a combined "motion to show cause and motion for attorney fees."

{¶22} In his first motion, Mr. Allen sought an order dividing the 2005 Excess Defined Benefit Plan in the same manner as the 2005 Excess Defined Contribution Plan. He also sought orders requiring Ms. Allen to provide documents and reports relating to all retirement/benefit plans and orders ensuring he will receive his share of benefits in the nonqualified plans in the event Ms. Allen should predecease him.

{¶23} In his second motion, Mr. Allen sought an order rescinding Ms. Allen's permission to make spousal supports directly to him and requiring her to make payments to the Geauga County Child Support Enforcement Agency ("CSEA").

6

{¶24} In his third motion, Mr. Allen sought an order requiring Ms. Allen to show cause why she should not be held in contempt for "multiple" violations of the divorce decree.

{¶25} Ms. Allen filed briefs in opposition to the motions, and the matter was set for an evidentiary hearing. Prior to the start of the hearing, the parties stipulated that the divorce decree would be further amended nunc pro tunc to reflect the division of the 2005 Excess Defined Benefit Plan in the same ratio and pursuant to the same terms as the 2005 Excess Defined Contribution Plan.

### *Evidentiary Hearing*

{¶26} Mr. Allen and Ms. Allen testified at the hearing and submitted numerous exhibits. Mr. Allen's counsel testified in support of his attorney fees.

{¶27} During his cross-examination of Ms. Allen, Mr. Allen's counsel began inquiring about her alleged conduct prior to the parties' divorce. The magistrate sustained Ms. Allen's objection, stating that it would not consider testimony relating to the time of the divorce.

{¶28} Counsel proffered Ms. Allen's anticipated testimony for the record. He stated Ms. Allen would testify that she pre-planned her departure from the home; she made plans to serve Mr. Allen with the divorce complaint while she was on an overseas trip; she began residing at a male co-worker's home; she removed items of personal property from the home; she initially failed to disclose the items she removed; she deleted information and photos from the household computer; and she was dishonest during her deposition.

7

Case No. 2021-G-0023

{¶29} During his direct examination of Mr. Allen, counsel proposed to inquire about "circumstances that occurred at the time of the divorce, that again, give [Mr. Allen] a reason not to trust his former spouse, and to believe that she would otherwise be deceptive with him." The magistrate sustained Ms. Allen's renewed objection.

{¶30} Counsel proffered Mr. Allen's anticipated testimony for the record. He stated Mr. Allen would testify that, in addition to committing the above acts, Ms. Allen caused difficulty in settling the parties' divorce and untimely paid spousal support on two occasions during the divorce proceedings.

{¶31} Following the hearing, the magistrate filed a decision setting forth findings of fact and conclusions of law. It found that Mr. Allen's motions lacked merit and recommended that the trial court deny them. Mr. Allen filed preliminary and supplemental objections to the magistrate's decision, which Ms. Allen opposed.

{¶32} The trial court filed a judgment entry approving and adopting the magistrate's decision and denying Mr. Allen's motions, which Mr. Allen appealed. Upon limited remand from this court, the trial court corrected its judgment entry via a nunc pro tunc entry.

{¶33} Mr. Allen presents the following five assignments of error:

{¶34} "[1.] The trial court erred in denying appellant opportunity [sic] to offer evidence regarding appellee's lack of credibility and deceptive conduct.

{¶35} "[2.] The trial court erred in denying appellant's motion for additional orders to enforce assignment of benefits.

{¶36} "[3.] The trial court erred in denying appellant's motion to show cause.

{¶37} "[4.] The trial court erred in denying appellant's motion for attorney fees.

8

{¶38} "[5.] The trial court erred in denying appellant's motion to rescind direct payment of spousal support."

## Standard of Review

{¶39} In reviewing an appeal from a trial court's decision adopting a magistrate's decision, we determine whether the trial court abused its discretion. *Nedel v. Nedel*, 11th Dist. Portage No. 2007-P-0022, 2008-Ohio-1025, ¶ 27. An abuse of discretion is the trial court's "'failure to exercise sound, reasonable, and legal decision-making.'" *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8th Ed.Rev.2004).

{¶40} Where the issue on review has been confided to the discretion of the trial court, the mere fact that the reviewing court would have reached a different result is not enough, without more, to find error. *Id.* at ¶ 67. In addition, if there is some competent, credible evidence to support the trial court's decision, there is no abuse of discretion. *Nedel* at ¶ 27. When a pure issue of law is involved in appellate review, however, the mere fact that the reviewing court would decide the issue differently is enough to find error. *Beechler* at ¶ 67.

## Exclusion of Evidence

{¶41} In his first assignment of error, Mr. Allen contends that the trial court erred in excluding evidence of Ms. Allen's alleged misconduct prior to the parties' divorce. Mr. Allen contends that his proffered evidence was admissible as other acts evidence pursuant to Evid.R. 404(B) and/or as impeachment evidence pursuant to Evid.R. 608(B)(1).

Case No. 2021-G-0023

***Other Acts Evidence***

**{¶42}** Evid.R. 404(A) is a general prohibition on using evidence of a person's character to prove he or she acted "'in conformity therewith on a particular occasion.'" *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, 172 N.E.3d 841, ¶ 71. Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**{¶43}** The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law. *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 22. A trial court is precluded from admitting improper character evidence under Evid.R. 404(B), but it has discretion to allow other-acts evidence that is admissible for a permissible purpose. *Graham* at ¶ 72.

**{¶44}** The Supreme Court of Ohio has set forth a three-part analysis for determining the admissibility of other-acts evidence. *Id; see State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 20. To be admissible, (1) the evidence must be relevant, Evid.R. 401, (2) the evidence cannot be presented to prove a person's character to show conduct in conformity therewith but must instead be presented for a legitimate other purpose, Evid.R. 404(B), and (3) the probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice, Evid.R. 403. *Graham* at ¶72.

**{¶45}** Mr. Allen's proffered evidence fails the first and second parts of the analysis. In the context of other-acts evidence, the question is whether the evidence was relevant

10

to the particular purpose for which it was offered. *Graham* at ¶ 75. The other-acts evidence must be probative of a purpose other than the person's character or propensity to behave in a certain way. *Id.* Mr. Allen did not offer the evidence for any of the permitted purposes under Evid.R. 404(B). Rather, his express purpose was "to relate circumstances that occurred at the time of the divorce, that * * * give [Mr. Allen] a reason not to trust his former spouse, and to believe that she would otherwise be deceptive with him." Thus, Mr. Allen sought to establish Ms. Allen's alleged propensity for deceitfulness, which is precisely the type of evidence that Evid.R. 404(B) prohibits. *See Graham* at ¶ 76. Accordingly, Mr. Allen's proffered evidence was not admissible as other-acts evidence pursuant Evid.R. 404(B) as a matter of law.

### *Impeachment Evidence*

{¶46} The decision to admit evidence of earlier misconduct of a witness for impeachment under Evid.R. 608(B) is within the sound discretion of the trial court. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 100.

{¶47} Evid.R. 404(A)(3) contains an exception to the general prohibition on character evidence, providing that "[e]vidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609." Evid.R. 608(B) provides, in relevant part, that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, *may not be proved by extrinsic evidence*. They may, however, in the discretion of the court, *if clearly probative of truthfulness or untruthfulness*, be inquired into on *cross-examination of the witness* (1) concerning the witness's character for truthfulness or untruthfulness * * *."

11

{¶48} Mr. Allen's direct testimony constitutes "extrinsic evidence" of Ms. Allen's alleged conduct. Therefore, it was not admissible pursuant to Evid.R. 608(B). *See State v. Workman*, 14 Ohio App.3d 385, 391, 471 N.E.2d 853 (8th Dist.1984) ("In no instances can such testimony be heard upon *direct* examination") (Emphasis sic.)

{¶49} We also find no error in the exclusion of Mr. Allen's proposed cross-examination of Ms. Allen. Evid.R. 608(B) requires "*a high degree of probative value* of instances of prior conduct *as to truthfulness or untruthfulness of the witness* before the trial court will allow such cross-examination." (Emphasis added.) *State v. Norwood*, 11th Dist. Lake No. 2000-L-146, 2002 WL 445839, *3 (Mar. 22, 2002); *see* 1980 Staff Notes to Evid.R. 608. Ms. Allen disputes the accuracy of her proffered testimony; thus, its probative value as to her "untruthfulness" is inconclusive.

{¶50} In addition, while "cross-examination of a witness is a matter of right," the "'*extent* of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court.'" (Emphasis added.) *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993), quoting *Alford v. United States*, 282 U.S. 687, 691, 51 S.Ct. 218, 75 L.Ed. 624 (1931). Evid.R. 611(A) provides that "[t]he court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."

{¶51} Here, the magistrate limited the presentation of evidence to the specific issues raised in Mr. Allen's motions rather than permitting the parties to relitigate issues from their acrimonious divorce. We find that the magistrate's exercise of control in this

12

regard was reasonable. Thus, the trial court did not abuse its discretion in adopting the magistrate's evidentiary ruling.

{¶52} Mr. Allen's first assignment of error is without merit.

## Motion for Additional Orders

{¶53} In his second assignment of error, Mr. Allen contends that the trial court erred in denying his motion for additional orders to enforce the assignment of retirement benefits.

{¶54} The magistrate found that Mr. Allen "seeks additional orders not included in the [divorce decree] or the in-court agreement" and that "[t]here is no meeting of the minds, agreement of the parties, or consideration for the modifications [Mr. Allen] seeks." In adopting the magistrate's decision, the trial court effectively determined that it was without jurisdiction to grant Mr. Allen's requested relief. The jurisdiction of the domestic relations court is an issue of law. *See Salvato v. Salvato*, 2013-Ohio-5268, 2 N.E.3d 974, ¶ 23 (11th Dist.).

{¶55} Retirement benefits are marital assets that are subject to division as personal property. *Longo v. Longo*, 11th Dist. Portage No. 2017-P-0061, 2018-Ohio-3535, ¶ 21. In order to divide unmatured benefits at the time of divorce, the trial court issues a QDRO or an equivalent judgment entry. *Sullivan v. Sullivan*, 6th Dist. Lucas No. L-09-1022, 2010-Ohio-3064, ¶ 12. The QDRO or entry "permits a division and distribution of *rights* to a benefit, the amount of which is as yet undetermined." (Emphasis sic.) *Layne v. Layne*, 83 Ohio App.3d 559, 565, 615 N.E.2d 332 (2d Dist.1992).

{¶56} R.C. 3105.171(I) provides, in relevant part, that "[a] division * * * of property * * * made under this section is not subject to future modification by the court except upon

13

Case No. 2021-G-0023

the express written consent or agreement to the modification by both spouses." Under the plain language of this statute, consent of both spouses is required before a trial court may modify a property division. *Williams v. Williams*, 1st Dist. Hamilton No. C-210331, 2022-Ohio-599, ¶ 14. However, the statutory prohibition has no effect upon the trial court's basic authority to *interpret* and *enforce* its prior judgment. *Longo* at ¶ 21.

{¶57} Mr. Allen purported to invoke the trial court's retention of jurisdiction in the decree "to enter further orders as are necessary *to enforce the assignment of benefits* to the non-participant as set forth herein." (Emphasis added.) According to Mr. Allen, this provision permitted the trial court to "take additional action" to "protect" his interest as a non-participant in the retirement plans. We disagree.

{¶58} When Mr. Allen filed his motion, the retirement benefits remained unmatured, and there was no post-decree event that negatively affected Mr. Allen's rights as a beneficiary. *See*, *e.g.*, *Sullivan*, *supra*, at ¶ 26-27 (the husband received vested benefits that he had transferred to another account); *Bevan v. Bevan*, 9th Dist. Lorain No. 06CA008969, 2008-Ohio-724, ¶ 1 (the husband elected to receive a different type of vested benefits from his pension fund). Rather than *enforcement*, Mr. Allen sought to *modify* the assignment of benefits to include more favorable terms. Without Ms. Allen's express written agreement, the trial court lacked jurisdiction to modify the decree in this manner. Thus, we find no error in the trial court's jurisdictional determination.

{¶59} Mr. Allen's second assignment of error is without merit.

14

**Motion to Show Cause**

{¶60} In his third assignment of error, Mr. Allen contends that the trial court erred in denying his motion to show cause, in which he asked the trial court to hold Ms. Allen in contempt for violating the divorce decree.

{¶61} Contempt of court has been variously defined as "disobedience of an order of a court" and "conduct which brings the administration of justice into disrespect, or which tends to embarrass, impede or obstruct a court in the performance of its functions." *Denovchek v. Bd. of Trumbull Cty. Commrs.*, 36 Ohio St.3d 14, 15, 520 N.E.2d 1362 (1988). "A court may punish disobedience of its order, pursuant to R.C. 2705.02(A) or the court's inherent power to enforce its authority." *State ex rel. Adkins v. Sobb*, 39 Ohio St.3d 34, 35, 528 N.E.2d 1247 (1988). "A finding of civil contempt requires clear and convincing evidence that the alleged contemnor has failed to comply with the court's prior orders." *Willoughby v. Masseria*, 11th Dist. Geauga No. 2002-G-2437, 2003-Ohio-2368, ¶ 25. A refusal to punish any disobedience is within the sound discretion of the court. *Welty v. Welty*, 11th Dist. Ashtabula No. 2007-A-0013 and 2007-A-0015, 2007-Ohio-5217, ¶ 25.

{¶62} Mr. Allen first contends that the trial court should have held Ms. Allen in contempt for violating the provision in the decree requiring her to provide her "end of year earnings statement(s) and Federal and State Tax Returns."

{¶63} Although the parties disputed the meaning of this provision, Mr. Allen testified, and the magistrate found, that Ms. Allen provided all requested documentation prior to Mr. Allen filing his motion to show cause. Mr. Allen does not challenge this finding on appeal. In fact, he concedes Ms. Allen was "perhaps not deserving of a contempt

15

finding on the issue of her year-end paystubs alone" but objects to her "cavalier attitude." A party can only be held in contempt of court for failing to comply with the language the court employed in the four corners of an applicable court order. *Miller v. Miller*, 11th Dist. Trumbull No. 2019-T-0048, 2020-Ohio-6914, ¶ 38. Thus, there is no basis for reversal.

{¶64} Mr. Allen next contends that the trial court should have held Ms. Allen in contempt for failing to pay spousal support from the funds she received from the Financial Planning Reimbursement Program. According to Mr. Allen, Ms. Allen violated the decree's provisions requiring her to pay, upon receipt, 45% of her "gross income from incentives, bonuses, enrichment income plans, and other income above and beyond her base pay earned after January 1, 2018" and 50% of her "gross income from incentives, bonuses, enrichment income plans, and other earned income above and beyond her base pay earned prior to January 1, 2018 and payable in 2018 through 2020." Mr. Allen contends that the reimbursement payments constituted "gross income" for purposes of these provisions.

{¶65} A divorce decree, like other contracts, can only be interpreted if the provisions are ambiguous or uncertain. *See Salvato, supra*, at ¶ 39. In construing a divorce decree, a court must give common words their ordinary meaning unless some other meaning is clearly suggested from the face of the decree or its overall contents. *Caldwell v. Caldwell*, 4th Dist. Gallia No. 02CA17, 2003-Ohio-1752, ¶ 12. Language is ambiguous if it is susceptible to two or more conflicting, yet reasonable, interpretations. *See Salvato* at ¶ 39. The determination of whether language is ambiguous is an issue of law. *See id.* If the language is capable of two reasonable but conflicting interpretations, however, there is an issue of fact as to the parties' intent. *Id.* at ¶ 40. The court must

16

examine parol or extrinsic evidence to determine the parties' intent, including the circumstances surrounding the parties at the time the contract was made and the objectives the parties intended to accomplish by entering into the contract. *Id.*

{¶66} As indicated, Ms. Allen agree to pay to Mr. Allen, upon receipt, (1) 45% of her "*gross income* from incentives, bonuses, enrichment income plans, and *other income* above and beyond her base pay *earned* after January 1, 2018," and (2) 50% of her "*gross income* from incentives, bonuses, enrichment income plans, and *other earned income* above and beyond her base pay *earned* prior to January 1, 2018 and payable in 2018 through 2020." (Emphasis added.) We find no ambiguity in the foregoing language. Contrary to Mr. Allen's assertion, Ms. Allen agreed to pay a percentage of her *earned* gross income beyond her base pay, not just her gross income. Such *earned* gross income included income from incentives, bonuses, and enrichment income plans.

{¶67} The Internal Revenue Code defines "gross income" as "all income from whatever source derived." 26 U.S.C. 61(a). In this context, however, the term "gross" means "consisting of an overall total exclusive of deductions." *Merriam-Webster*, https://www.merriam-webster.com/dictionary/gross (accessed August 26, 2022); *see Black's Law Dictionary*, gross (11th Ed.2019) (defining "gross" as "[u]ndiminished by deduction; entire").

{¶68} The Internal Revenue Code defines "earned income" in various ways, depending on the taxation context in which it is used. *Czubaj v. Tallmade*, 9th Dist. Summit No. 21389, 2003-Ohio-5466, ¶ 22; *see*, *e.g.*, 26 U.S.C. 32(c)(2)(A) (earned income tax credit); 26 U.S.C. 911(b)(1)(A) (foreign earned income). Black's Law Dictionary defines "earned income" as "money derived from one's own *labor or active*

17

*participation*; earnings from *services*." (Emphasis added.) *Black's Law Dictionary*, income (11th Ed.2019). Similarly, the dictionary definition of "earned income" is "income (as wages, salary, professional fees, or commissions) that results from the *personal labor or services* of an individual." (Emphasis added.) *Merriam-Webster*, https://www.merriam-webster.com/legal/earned%20income (accessed August 26, 2022). The Ninth District Court of Appeals has defined "earned income" in the context of an income tax ordinance as requiring "some form of *service* that results from an affirmative *act*." (Emphasis added.) *Czubaj* at ¶ 22; *see also Campbell v. Plusquellic*, 9th Dist. Summit No. 14936, 1991 WL 76863, *2 (May 8, 1991) ("earned" means "to gain, get, obtain, or acquire as the reward of labor or performance of some service").

{¶69} Here, the reimbursement payments to Ms. Allen certainly qualified as "gross income" subject to taxation; however, the payments did not constitute *earned* gross income because they did not derive from Ms. Allen's labor or services to her employer. Rather, payments from this program are more accurately characterized as a "fringe benefit," i.e., a "benefit (other than direct salary or compensation) received by an employee from an employer, such as insurance, a company car, or a tuition allowance." *Black's Law Dictionary*, benefit (11th Ed.2019); *see Merriam-Webster*, https://www.merriam-webster.com/dictionary/fringe%20benefit (accessed August 26, 2022) (defining "fringe benefit" as "an employment benefit (such as a pension or a paid holiday) granted by an employer that has a monetary value but does not affect basic wage rates").

{¶70} Alternatively, the reimbursement payments may be characterized as a "perquisite," i.e., a "privilege or benefit given in addition to one's salary or regular wages."

18

Case No. 2021-G-0023

*Black's Law Dictionary*, perquisite (11th Ed.2019); *see Merriam-Webster*, https://www.merriam-webster.com/dictionary/perquisite (accessed August 26, 2022) (defining "perquisite" as "a privilege, gain, or profit incidental to regular salary or wages").

{¶71} The dissent argues that based on "any possible interpretation," the reimbursement payments constituted "gross income" from a "bonus." Notably, the dissent's construction is based, in part, on its review of the evidentiary record. Such considerations are only appropriate if language is ambiguous, i.e., "capable of two reasonable but conflicting interpretations." *Salvato*, *supra*, at ¶ 40. The dissent does not contend that the language is ambiguous.

{¶72} The fatal flaw in the dissent's construction is its failure to give any effect to the decree's multiple uses of the term "earned." Rather, the dissent incorrectly separates the language into two categories, i.e., (1) gross income from incentives, bonuses, and enrichment income plans; and (2) other income above and beyond Ms. Allen's base pay earned prior to or after January 1, 2018.

{¶73} Proper contract interpretation includes the application of ordinary rules of grammar. *Oliveri v. OsteoStrong*, 2021-Ohio-1694, 171 N.E.3d 386, ¶ 21 (11th Dist.). Here, the decree uses the term "other," which signifies the existence of prior examples. Thus, the phrases "earned after January 1, 2018" and "earned prior to January 1, 2018 and payable in 2018 through 2020" modify the phrases "other income above and beyond [Ms. Allen's] base pay" *and* "gross income from incentives, bonuses, [and] enrichment income plans." In other words, the provisions apply to Ms. Allen's *earned* gross income above and beyond her base pay earned after January 1, 2018, or earned prior to that

19

date if payable during 2018 through 2020, including *earned* gross income from incentives, bonuses, and enrichment income plans.

{¶74} Contrary to the dissent's assertion, our construction does not mean that only base pay would constitute *earned* gross income. The provision itself provides examples of such *earned* gross income, i.e., from "incentives," "bonuses," and "enrichment income plans." In fact, the definition of "bonus" quoted by the dissent demonstrates that a "bonus" derives from an employee's performance of "services." *See Black's Law Dictionary*, bonus (11th Ed.2019) ("In the employment context, workers' bonuses * * * are paid for *services* or on consideration in addition to or in excess of the compensation that would ordinarily be given. — Also termed bonus payment") (Emphasis added.) Similarly, an "incentive-pay plan" is defined as "a compensation plan in which increased *productivity* is rewarded with higher pay." (Emphasis added.) *Black's Law Dictionary*, incentive-pay plan (11th Ed.2019). Obviously, all employee compensation derives from the fact that the individual is employed; however, not all employee compensation is *earned*, i.e., income derived from the employee's performance of labor or services.

{¶75} Accordingly, based on the plain and ordinary meaning of the decree's language, Ms. Allen's spousal support obligation did not encompass the reimbursement payments.

{¶76} The magistrate found that the reimbursement program was not addressed in the parties' divorce negotiations or in-court agreement and that Mr. Allen testified that he had knowledge of the program, could have included it in the in-court agreement, or could have filed a motion for relief from judgment. The magistrate also found that the

20

reimbursement program "is not a bonus program, nor is it subject to taxes" and that Mr. Allen's demand for a portion constitutes "double dipping."

{¶77} It is unclear whether the magistrate found the decree to be ambiguous or unambiguous. In addition, the magistrate's finding that the reimbursement payments were not subject to taxes is inconsistent with the evidence presented. However, the magistrate's ultimate conclusion is correct based on the decree's unambiguous language. Thus, there is no basis for reversal.

{¶78} Mr. Allen next contends that the trial court should have held Ms. Allen in contempt for failing to pay his share of a 2017 bonus until two and half years after she received the funds. However, the hearing transcript reflects counsel twice stipulated that the 2017 bonus was not subject to Mr. Allen's motion to show cause. Thus, Mr. Allen has waived this argument.

{¶79} Mr. Allen's third assignment of error is without merit.

**Motion for Attorney Fees**

{¶80} In his fourth assignment of error, Mr. Allen contends that the trial court erred in denying his motion for attorney fees because he "clearly proved" Ms. Allen's "contemptuous conduct" at the hearing. Since we find no error in the trial court's decision not to hold Ms. Allen in contempt, Mr. Allen's argument necessarily lacks merit. *See Miller*, *supra*, at ¶ 43.

{¶81} Mr. Allen's fourth assignment of error is without merit.

Case No. 2021-G-0023

**Motion to Rescind**

{¶82} Finally, in his fifth assignment of error, Mr. Allen contends that the trial court erred in denying his motion to rescind Ms. Allen's permission to make direct payments of spousal support.

{¶83} "[W]hen a court pursuant to section 3105.18 * * * issues * * * an order requiring an obligor to pay spousal support * * *, the court may permit the obligor to make the spousal support payments directly to the obligee instead of to the office [of child support in the department of job and family services] * * *." R.C. 3121.441(A). "If a court permits an obligor to make spousal support payments directly to an obligee pursuant to division (A) of this section and the obligor is in default in making any spousal support payment to the obligee, the court, upon motion of the obligee or on its own motion, *may* rescind the permission granted under that division." (Emphasis added.) R.C. 3121.441(C).

{¶84} Since the governing statute uses the term "may," the trial court had discretion to grant or deny Mr. Allen's motion. *See Ohio Civ. Serv. Emps. Assn. v. Univ. of Cincinnati*, 3 Ohio App.3d 302, 304, 444 N.E.2d 1353 (1st Dist.1982) ("[G]enerally 'may' is a permissive term and its use in a statute imparts discretion to the party or parties whose conduct is governed by a statute containing it").

{¶85} The magistrate acknowledged Ms. Allen's untimely payments but found that the facts and circumstances did not warrant CSEA's involvement.

{¶86} On appeal, Mr. Allen challenges the credibility of Ms. Allen's testimony. However, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact[,] and an appellate court may not substitute its own judgment

22

for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). The factfinder is free to believe all, part, or none of the testimony of each witness appearing before it. *Welty*, *supra*, at ¶ 32. In addition, Ms. Allen's testimony was supported by documentary evidence submitted at the hearing. Accordingly, we find no basis for reversal.

{¶87} Mr. Allen's fifth assignment of error is without merit.

{¶88} In sum, we conclude that the trial court did not abuse its discretion in adopting the magistrate's decision.

{¶89} For the foregoing reasons, the judgment of the Geauga County Court of Common Pleas, Domestic Relations Division, is affirmed.


CYNTHIA WESTCOTT RICE, J., concurs,

MATT LYNCH, J., concurs in part and dissents in part, with a Dissenting Opinion.


———————————


MATT LYNCH, J., concurs in part and dissents in part, with a Dissenting Opinion.

{¶90} I concur with the majority's disposition of the first, second, and fourth assignments of error. I dissent from the majority's holding in the third assignment of error that the appellee's reimbursement program funds were not subject to the spousal support provision. The parties' divorce decree required that a percentage of appellee's gross income, including bonuses and other incentives, be paid to appellant and under any possible interpretation of the wording of that provision, the reimbursement funds are part of that gross income.

Case No. 2021-G-0023

{¶91} Pursuant to the decree, appellee was ordered to pay 45% of her "monthly gross base salary" and 45% "of her gross income from incentives, bonuses, enrichment income plans, and other income above and beyond her base pay earned after January 1, 2018." She was further ordered to pay 50% of her "gross income from incentives, bonuses, enrichment income plans and other earned income above and beyond her base pay earned prior to January 1, 2018." Gross income as defined under federal law includes income from "whatever source derived" including "[c]ompensation for services" as well as "fringe benefits." 26 U.S.C. 61(a)(1). The reimbursement funds fall under this definition. In addition, the documentation relating to the reimbursement program states that it is "considered taxable income by the IRS and will be included on the employee's W2 form." "A Form W-2 includes '[w]ages, tips, and other compensation' an employee is actually *paid.*" *Mathews v. ALC Partner, Inc.,* E.D. Mich. No. 08-cv-10636, 2009 WL 3837249, *5 (Nov. 16, 2009). Pursuant to the foregoing, the reimbursement program falls under the clear definition of gross income as applied by the IRS and was treated as pay or compensation, which is unquestionably gross income.

{¶92} The majority concludes, however, that the terms of the spousal support provisions do not include "gross income" but only "earned gross income" since they reference income "beyond her base pay *earned* after January 1, 2018" as well as "earned income above and beyond her base pay earned prior to" that date. It concludes that the reimbursement plan was not part of appellee's "gross earned income" since it is a fringe benefit. This conclusion oversimplifies the issue and fails to take into account the entirety of the applicable provisions in the divorce decree, including their reference to "gross income" such as bonuses and incentives.

24

Case No. 2021-G-0023

{¶93} The majority declines to address whether the plan is a "bonus" or "incentive," which are specifically delineated as types of gross income requiring payment of spousal support. Here, the reimbursement was a benefit provided to certain executives who were nominated for such benefit. In appellee's testimony in the trial court, when asked about receiving compensation under this nomination scheme, she stated that it was "bonus compensation." A "bonus" is defined as: "A premium paid in addition to what is due or expected. In the employment context, workers' bonuses are not a gift or gratuity; they are paid for services or on consideration in addition to or in excess of the compensation that would ordinarily be given." *Black's Law Dictionary* 144 (7th Ed.2000). The record indicates that the reimbursement plan was given to "select" individuals within the company and appellee was among those elected to receive such funds. Thus, this would not be characterized as compensation ordinarily given to employees nor had she received it throughout her entire employment. It is also noteworthy that the plan, as stated in 2019 documents, is referred to as the "LTIP Financial Planning Reimbursement Program." LTIP, or long term incentive programs, are, by their own name, "incentives" provided to employees. *See Avakian v. Avakian*, 11th Dist. Portage No. 2014-P-0036, 2015-Ohio-2299, ¶ 48 (an LTIP incentive plan which is part of a "compensation plan" falls within the definition of a bonus and is something given in addition to what would ordinarily be due or expected). Just like a bonus, an incentive is specifically set forth as one of the items of which appellant is to receive a portion. An "earned gross income" analysis is inapplicable when the provision specifically sets forth that this type of benefit is subject to the spousal support award. If a bonus or incentive is determined by the majority to be outside of the scope of support because it is not "earned gross income," it is difficult to

25

envision what, aside from base pay, could be eligible as income, rendering much of the wording of the spousal support provision meaningless. While the majority argues that these are subject to an earned gross income analysis because the word "earned" modifies all income apart from her base pay, under this interpretation, there would be no reason to list incentives and bonuses separately if they were to be treated the same as all other income.

{¶94} It should also be emphasized that the reimbursement was treated as the equivalent of salary, such that the outcome of being subject to spousal support is both logical and consistent with the terms of the support provision. As noted above, it was considered taxable income and included on appellee's W-2. Pursuant to 2020 documentation, appellee was provided with up to $4,000 for services which would have otherwise come out of her base pay/salary such as tax preparation and legal financial services. In other words, it provided her with additional funds to pay expenses just as would an increased salary, which would be subject to the spousal support requirement. *See Morrow v. Becker*, 138 Ohio St.3d 11, 2013-Ohio-4542, 3 N.E.3d 144, ¶ 15 ("If his employer did not provide a car, Morrow would have had to purchase or lease one on his own, using his own funds. Accordingly, it is sensible to conclude that the provision of a car is no different from the provision of funds to buy or lease a car. Either way, the person receiving the benefit effectively has a higher income."). Neither the wording of the provisions included in the divorce decree nor a reasonable application to the circumstances of the parties compel the conclusion reached by the majority, since a benefit that increases one's overall earnings and income by decreasing her expenses for the year should logically be part of the income subject to a support obligation.

26

{¶95} Finally, even if it were proper to consider only whether the reimbursement in dispute is "earned gross income" as defined by the majority, the funds would be subject to the support order. The award of the reimbursement was based on appellee's performance in her job, which led to her election to receive such a benefit. It resulted from her services provided to the company and presumably the level of her job performance. It is unlike the examples provided by the majority, such as insurance or a company car that may be given to any employee as part of the benefits of the position unrelated to their job performance or service to the company.

{¶96} In sum, under any interpretation of the plain terms of the spousal support provisions, the reimbursement program is subject to the support award. To hold otherwise is contrary to the divorce decree. For these reasons, I dissent as to the third assignment of error and would reverse the lower court's ruling on this issue.